# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 8, 2016

## STATE OF TENNESSEE v. GEORGE A. BELT

**Appeal from the Circuit Court for Bedford County**
**No. 18024     Forest A. Durard, Jr., Judge**

___

### No. M2016-00663-CCA-R3-CD

___

The defendant, George A. Belt, was convicted by a Bedford County Circuit Court jury of two counts of rape, Class B felonies; one count of incest, a Class C felony; and one count of purchasing alcohol for a minor, a Class A misdemeanor. The trial court merged the rape convictions and imposed a sentence of twenty years for that conviction. The court imposed a sentence of ten years for the incest conviction and eleven months and twenty-nine days for the purchasing alcohol for a minor conviction. The court ordered that all the sentences be served concurrently. On appeal, the defendant challenges the sufficiency of the evidence convicting him of rape and incest and also argues that the trial court imposed an excessive sentence. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Donna Orr Hargrove, District Public Defender; and Michael J. Collins (on appeal and at trial) and James R. Tucker, Jr. (at trial), Assistant Public Defenders, for the appellant, George A. Belt.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert J. Carter, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

### State's Proof

The victim's mother testified that she had five children, including her daughter, the victim, who was fourteen years old at the time of trial in November 2015. The victim's mother said that the defendant was her husband and that they married in June 2009. By January 2015, she and the defendant were living in Bedford County with the victim and the victim's mother's two youngest sons. At that time, the victim's mother worked a 2:00 p.m. to 11:00 p.m. shift five to seven days a week.

The victim's mother testified that she went to work on Saturday, January 10, while her sons spent the day with her mother and the victim stayed home with the defendant. That night, she unexpectedly got off work early and arrived home around 9:30 p.m. The victim was already in bed asleep, and the defendant told her that the victim "had been sick, that her stomach was bothering her." The victim's mother slept late the next morning, and then the family went to the victim's mother's house for dinner that evening. The victim "was just real quiet," but the victim's mother "just assumed her stomach was still bothering her like from the day before." A few days later, the victim's mother learned that something had happened to the victim on January 10. The victim's mother said that she was still married to the defendant but only because she "can't afford to get a divorce right now."

The victim testified that, on the day in question, she was at home with the defendant, while her mother was at work and brothers were at her grandmother's house. The defendant invited her to go with him to the liquor store. The victim went inside the store with the defendant, and he purchased a bottle of whiskey for himself and two "puckers"[1] for the victim. When they got home, they went to the bedroom that the defendant and the victim's mother shared to watch television and drink. The victim sat on a futon sofa, and the defendant sat on the bed. After the victim drank the "puckers," the defendant invited her to sit on the bed and drink some of his whiskey. The victim began feeling drunk and was not sure whether she passed out or fell asleep, but the next thing she remembered was being in her own room. She was lying on her back on her bed. The defendant was touching her directly on her vagina with his mouth. He also touched her vagina with his hand, but she did not know whether his hand went inside her vagina. He touched her vagina with his erect penis and tried to "push it in." The victim said that "[i]t hurt" when he attempted to penetrate her. The victim denied encouraging or

---

[1] "Puckers" are fruit flavored small bottles of alcohol that are three or four inches tall.

wanting the defendant to touch her. She did not say anything to the defendant during the ordeal and was not sure whether he knew that she was awake.

The victim testified that she did not remember her mother coming home, but she was aware that her mother was home when she awoke the next morning. When she got up, the victim had a headache and her vagina was sore. The victim did not tell her mother about what had happened because she "didn't want to hurt anybody else." However, a few days later, she told a friend at school, who told the school resource officer. Thereafter, the victim told the resource officer herself and, later, a detective who came to school to talk to her.

The victim recalled that, the day after the rape, she and the defendant went to the park for a "mini driving lesson type thing." During that time, the defendant asked her if she was still a virgin. The victim asked the defendant, "Why are you asking that?" but could not remember his reply.

Lori Littrell, a physician assistant at "Our Kids Center," testified that she conducted a forensic medical examination of the victim on January 20. A medical history was obtained from the victim, including information about her general health, and then the victim was asked specific questions about any type of sexual contact that had happened to her. The victim reported that the parts of her body that no one should touch "are her downstairs butt and breasts." She said that her stepfather had touched her "downstairs," pointing to her genital area, with his hands on her skin, "o[n] the outside." She said that this contact happened one time. The victim related that her stepfather also touched her "downstairs," again pointing to her genital area, "[o]n the outside, "[o]n [her] skin," with "[h]is thing." The victim reported that her "part inside was a little sore the next day, but I know it didn't go all the way in." She said that this contact happened one time. When asked if her stepfather touched her with any other part of his body, the victim said, "[h]is tongue," again "[o]n the outside" and "[o]ne time." The victim said that the contacts happened "in [her] bedroom on the bed. [The defendant] was kind of standing, leaning over the bed." The victim stated that she had been drinking that night. The victim denied having to touch the defendant's body in any way and denied having any type of sexual contact with any other person.

Ms. Littrell testified that, after taking the medical history, she conducted an anogenital examination on the victim. Ms. Littrell said that the victim "had a normal anogenital exam. So, when we looked for any signs of injury or signs of infection, everything looked normal in her genital area and her anal area." However, Ms. Littrell stated that a normal exam did not mean that the victim had not been the victim of penile or digital penetration. She explained that the majority of children who are evaluated for concerns of sexual abuse do not have any kind of physical injury and that the statistics

showed that injury is actually uncommon.  Ms. Littrell explained the female anatomy and how a young girl or young woman could experience penetration without experiencing injury.  She also explained that injury would not be expected with certain types of sexual contact or with penile genital contact that did not "go all the way through the hymen and into the vaginal canal."  Ms. Littrell further explained that an injury to a child could heal quickly and completely before the child reports an incident.  Ms. Littrell concluded that the findings of her examination of the victim did not rule out the possibility that the victim was sexually abused.

Detective Carol Jean with the Shelbyville Police Department testified that she and James Brinkley, a case worker with the Department of Children's Services, met with the victim at her school on January 15, 2015, in response to a report of possible sexual abuse.  The victim identified the defendant as the perpetrator and related that the incident had occurred on January 10 at her home.  After the interview with the victim, Mr. Brinkley contacted the defendant and requested that he go to the police department to speak with the officers.

When the defendant arrived, Detective Jean and Detective Sergeant Chucky Merlo met with the defendant in an interview room and read him his Miranda rights.  After waiving his rights, the defendant participated in an interview.  The defendant admitted to taking the victim to the liquor store, buying her alcohol, and taking her back to the house where they drank together.  The defendant admitted that the victim got drunk and that he took her to her room and put her in her bed.  During the first interview, the defendant denied having any sexual contact with the victim, but he admitted that he took the victim out for a driving lesson the next day during which he asked her if she was still a virgin.  When asked why he would ask his fourteen-year-old stepdaughter such a question, the defendant responded "that when he passed her room the night before, . . . she had her hand in her shorts."

Detective Jean testified that the detectives met with the defendant again five days later, and Special Agent Melanie Garner with the Tennessee Bureau of Investigation, "TBI," assisted in the interview.  The defendant's story slowly began to change during the second interview, going from a complete denial of any sexual contact to admitting multiple sexual contacts with the victim that night.  The defendant initially explained that he touched the victim between her legs when "he reached and grabbed her to pick her up to put her to bed."  When questioned about the allegation of penile contact, the defendant offered an explanation as to how his penis could have accidentally come in contact with and penetrated the victim's vagina.  The defendant explained to the officers that he had "some big boxer shorts.  And the flap didn't have a button, or . . . snap, zipper or whatever.  It was just an open flap.  And that [his penis] may have accidentally fallen out and fallen in her vagina."   The defendant admitted that he had an erection while putting

the victim in her bed, but he denied that he was sexually attracted to the victim. The defendant said that he held the victim's hands down but explained that he did so "[t]o keep her in the bed[.]" The defendant offered as an explanation as to how the victim's shorts and underwear were moved out of the way that the victim "was grabbing at her underwear and his shorts." When asked how far he penetrated the victim with his penis, the defendant said, "It went in a little. And then he realized what was going on and he stopped."

Detective Jean testified that, after the interview, the defendant gave a written statement that was dictated by him and written by Detective Jean "[l]ine for line." Detective Jean read the statement back to the defendant, and he signed it saying that it was correct. Detective Jean read the statement to the jury as follows:

> [The victim] fell from her bed. I go to put her back in her bed, she wraps her legs around mine because she didn't want to get up. We were on the bed. I was holding her arms. She bit my shoulder on the side and got one hand free. She started arching her body and pulling at her panties. I was hard. And the tip of my penis goes in [the victim]'s vagina for a split second. I realized what happened and had to get up and stop it immediately. I finally get up and get out of the room. Then she continued being irritating to me for another ten minutes or so. Then she goes in her room supposedly watching t.v.

Special Agent Melanie Garner with the TBI testified that she interviewed the defendant on January 20, 2015. She conducted the first part of the interview alone, and then Detective Jean joined her. During the interview, the defendant admitted that he provided alcohol to the victim and spoke about the victim's "being intoxicated or drunk." However, he initially denied having any sexual contact with the victim. Agent Garner specifically asked the defendant if his penis ever touched or entered the victim's vagina, or if he moved her underwear out of the way, and "[i]nitially it was denial." She challenged the defendant, telling him that she did not believe he was telling the truth and, eventually, the defendant admitted having sexual contact with the victim.

Agent Garner recalled that the defendant admitted touching the victim between her legs with his hand in the process of carrying her to bed. He also said that the victim pulled on him, causing him to stumble on top of her in the bed. The defendant then began to slowly admit that his penis may have fallen out of his shorts and touched the victim's vagina. The defendant denied being sexually attracted to the victim but admitted that he had an erection while he was with her that night, including when his penis came into contact with her vagina. The defendant explained that he held the victim's hands down to keep her from getting back up, but that the victim somehow got a hand free and

moved her underwear to the side at which point a small portion of his penis went inside the victim's vagina for a very brief period of time. An audio/visual recording of the interview was played in court for the jury.

**Defendant's Proof**

The defendant testified that the victim is his stepdaughter. He denied raping the victim, putting his penis or fingers inside of her, or touching her inappropriately. He recalled that, on the night in question, he and the victim returned from buying alcohol around 6:30 or 7:00 p.m. and watched television together. The victim drank the "little Pucker things" and some wine that they had in the refrigerator. The victim also tried to get some of his drink, but he took it away from her. The defendant said that the victim had consumed alcohol in his and the victim's mother's presence before, but he clarified that they "didn't let her drink like on a regular basis or nothing like that." The defendant testified that, while he and the victim watched television, he talked on the phone to his daughter, mother, and grandmother.

The defendant testified that the victim was "maybe a little tipsy." He recalled that, "out of nowhere," the victim vomited on her mother's side of the bed and on the floor. The defendant carried the victim to her bed, washed off her face, and then cleaned up the vomit in his room. He said that the victim went to her room before her mother got home around 9:00 or 9:30 but then came back into his and the victim's mother's room and "act[ed] silly" with them. The victim's mother asked if the victim had been drinking and said "nothing else [to] drink for her, period." The victim's mother made the victim go to bed around 10:00.

The defendant testified that, later, he and the victim's mother heard the victim "moaning" in her room. He looked in the victim's room without going in and saw that the victim "was in her bed masturbating." The defendant said that he "didn't go in [the victim's] room the whole time [his] wife was back home from work" and that the victim went to her bedroom on her own. Asked why the victim may have made up stories about the defendant's touching her, the defendant said, "I don't know. I don't know. All I know is her mother would come home this day, that day, telling me different stories she's telling her. And she didn't know what to believe. I didn't know what to believe."

Asked why he made the admissions to Agent Garner if they were not true, the defendant responded, "I had been there for so long, I was tired, I was ready to go. And I started getting the feeling they just wasn't [sic] going to let me leave until I told them something they wanted to hear."

-6-

Following the conclusion of the proof, the jury convicted the defendant of two counts of alternate theories of rape, one count of incest, and one count of purchasing alcohol for a minor.

The trial court conducted a sentencing hearing, at which the court first merged the two rape convictions into one conviction. The State then introduced judgments against the defendant showing a prior conviction in Tennessee for the sale of marijuana in a school zone and prior convictions in Kentucky for facilitation of robbery, possession of a forged instrument, and trafficking a controlled substance.

The victim's mother testified at the sentencing hearing concerning the impact of the defendant's crime on her family. The victim's mother stated that the victim's grades had declined and that she was unable to sleep some nights, was quieter than she used to be, and had "big trust issues now." She said that her two younger sons knew the defendant "as daddy" and that "what [the defendant] did to [their] family is reprehensible."

After hearing arguments from the parties, the trial court imposed a sentence of twenty years for the rape conviction, ten years for the incest conviction, and eleven months and twenty-nine days for the purchasing alcohol for a minor conviction. The court ordered that the sentences be served concurrently for an effective term of twenty years.

The defendant appealed.

## ANALYSIS

### I. Sufficiency

The defendant challenges the sufficiency of the evidence, arguing that the victim's testimony was insufficient to sustain his convictions for rape and incest when he testified at trial denying having raped the victim and there was no medical evidence to corroborate the victim's testimony.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v.

Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As relevant here, rape is defined as the "unlawful sexual penetration of a victim by the defendant" when "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent" or "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]" Tenn. Code Ann. § 39-13-503(a)(2) and (3). "Sexual penetration" includes "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital . . . openings of the victim's . . . body." Id. § 39-13-501(7). In addition, "[a] person commits incest who engages in sexual penetration . . . with a person, knowing the person to be . . . [t]he person's . . . stepchild." Id. § 39-15-302(a)(1).

The defendant argues that the "lack of forensic medical evidence in this case appears to corroborate [his] position" that he "did not have any sexual contact with [the victim] whatsoever." However, the expert testimony at trial from Physician Assistant Lori Littrell established that the lack of physical trauma to the victim's anogenital region did not mean that penetration did not occur. In fact, Ms. Littrell testified that "injury is actually really uncommon." Therefore, the lack of forensic medical evidence in no way corroborates the defendant's denial of sexual contact with the victim.

-8-

The defendant also argues that "this case turns on the testimony of [the victim], and . . . her testimony was not enough for the jury to convict on the charges, since [he] also testified and denied the rape." However, it is well-established that credibility determinations, as well as the weight and value of the evidence and the resolution of conflicts in the testimony, are within the province of the jury as the trier of fact. See State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citing State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)). As was its province, the jury obviously found the victim's testimony to be credible and of sufficient weight to convict the defendant. Moreover, the defendant fails to mention that he admitted during his interview with TBI Special Agent Melanie Garner that his penis penetrated the victim's vagina. The evidence is sufficient to sustain the defendant's convictions.

## II. Sentencing

Lastly, without going into great detail, the defendant argues that the sentence imposed by the trial court is excessive and contrary to law.

A trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
>
> (2) The presentence report;
>
> (3) The principles of sentencing and arguments as to sentencing alternatives;
>
> (4) The nature and characteristics of the criminal conduct involved;
>
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
>
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." State v. Bise, 380 S.W.3d 682, 709-10 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

In sentencing the defendant, the trial court first determined the defendant to be a Range II offender for the rape and incest convictions, a determination the defendant does not contest, subject to a term of twelve to twenty years for the rape conviction and six to ten years for the incest conviction. See Tenn. Code Ann. § 40-35-112(b)(2) and (3). The court also determined that the defendant had eight prior felonies, four of which merged into one for enhancement purposes. The defendant's prior convictions included multiple counts of trafficking a controlled substance, multiple counts of possession of a forged instrument, as well as convictions for facilitation of robbery and sale of marijuana in a school zone. In looking at enhancement factors, the court found that the defendant had a previous history of criminal convictions in addition to those necessary to establish the range. See id. § 40-35-114(1). The court also found that the offenses were committed to gratify the defendant's desire for pleasure or excitement under Tennessee Code Annotated section 40-35-114(7). The court also noted multiple instances when the defendant failed to comply with the conditions of release into the community. See id. § 40-35-114(8). Lastly, the court found that the defendant abused a position of private trust under Tennessee Code Annotated section 40-35-114(14). Enhancement of the defendant's sentences was clearly permissible based on the statutory enhancement factors.

In addition, at the sentencing hearing, the victim's mother testified that the victim's grades had declined and that she was unable to sleep some nights, was quieter than she used to be, and had "big trust issues now." The victim's mother testified that the defendant's crimes had also affected her two young sons, who had regarded the defendant "as daddy."

The defendant offers nothing more than the conclusory statement that "the punishment imposed does not fit the crime of the offender." However, the sentences imposed by the trial court are within the proper range and nothing suggests an abuse of discretion by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE